**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X
                                                          :

GUO HUA JIN,                               :

                                        :    **Case No. 20-cv-3603-FB-MMH**

                        **Plaintiff,**    :

                                        :    **FIRST AMENDED COMPLAINT**

         **v.**                            :

                                        :    **DEMAND FOR A JURY TRIAL**

                                        :

**THE CITY OF NEW YORK, SERGEANT**    :
**YAUDY FERNANDEZ, POLICE OFFICER**    :
**JULIO VASQUEZ, POLICE OFFCER ELVIN**    :
**MERA, POLICE OFFICER MICHAEL**    :
**BONGIORNO, POLICE OFFICER ARIELLE**    :
**GIGANTE & POLICE OFFICER LISA**    :
**ZEPPETELLI,**    :

                                        :

                        **Defendants.**    :

                                        :
-------------------------------------------------------------------------------X

        Plaintiff GUO HUA JIN (hereinafter "plaintiff"), by and through her attorney herein, Michael R. Curran, Esq., alleges the following in connection with this consolidated suit in negligence and violation of plaintiff's civil rights:

**NATURE OF THE ACTION**

1.     Plaintiff brings this action for compensatory damages, punitive damages, if applicable, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of her civil rights under 42 U.S.C. § 1983 and Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff also asserts claims under New York law as to the government actors. Body worn camera ("BWC") videos are incorporated into the averments in the Complaint as integral to the allegations. The Court has set a 09/10/2021 Protective Order upon the BWC videos, restricting the public's viewing of the videos.[1]

_____

[1] Plaintiff respectfully requests the Court to view BWC videos incorporated herein in considering the First Amended Complaint,

## JURISDICTION

2.      This Court has jurisdiction over plaintiff's federal law claims under 28 U.S.C. §§ 1331, 1343(a)(3),(4).

3.      This Court may also exercise supplemental jurisdiction over the plaintiff's state law claims that arise from the same facts and circumstances under 28 U.S.C. § 1367 as to state-related causes of action.

## JURY TRIAL DEMANDED

4.      Plaintiff demands trial by jury of all issues properly triable thereby.

## VENUE

5.      Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b),(c), as all events herein occurred within the territorial Eastern District of New York.

## CONDITION PRECEDENT SATISFIED AS TO THE MUNICIPALITY

6.      As to the municipality of the City of New York, a Notice of Claim was timely filed on August 1, 2019, with the New York City Comptroller at 1 Centre Street, New York, New York 10007, following dismissal of the criminal action brought against plaintiff on May 15, 2019.  The Notice of Claim was assigned Claim No. **2019PI021053** by the City of New York.  Plaintiff appeared for the requisite hearing pursuant to Section 50-H of the General Municipal Law held on October 11, 2029, which was terminated due to problems with the interpreter, and finally on October 29, 2019, which was completed, at the private law offices of a firm retained by the City of New York.  These actions have satisfied the condition precedent for bringing a legal action against the City of New York, its subdivisions and individual actors.

## THE PARTIES

7.      Plaintiff GUO HUA JIN is a naturalized United States citizen, recently naturalized, presently residing in the State of New Jersey, where she moved during the pandemic.

___

as the videos are "integral" to allegations.  Nine (9) NYPD BWC videos and two (2) redacted DA BWC videos were disclosed.

8.      That at all times herein mentioned, defendant CITY OF NEW YORK (hereinafter "City") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

9.      That at all times herein mentioned, defendant City operated, controlled and maintained a municipal police force known as the NEW YORK CITY POLICE DEPARTMENT (hereinafter "NYPD"), which was empowered and authorized to arrest, detain, book, prepare paperwork on, assign NYSIDs, notify federal law enforcement entities of and produce for prosecution criminal suspects, perpetrators or accused.  The NYPD employed the individual defendant Police Officers in this matter.

10.     Defendant Sergeant YAUDY FERNANDEZ (hereinafter "Sgt. Fernandez"), at all times herein, was employed by the NYPD at the 109th Police Precinct, as a supervising police officer with authority and power over the conduct of police officers and supervisor of the procedure for arresting suspects.

11.     That at all times herein mentioned, defendant Sgt. Fernandez was acting within the course and scope of his employment with defendant City and the NYPD.

12.     That at all times herein mentioned, Sgt. Fernandez was acting under color of state law.

13.     Defendant Sgt. Fernandez is sued herein in both his individual and official capacities.

14.     The following BWC video from the body worn camera of Sgt. Fernandez is identified by counsel as "**CONFIDENTIAL-2019-04-13_21-29-20_SGT_FERNANDEZ,_YAUDY_(943227).AVI**."

15.     Defendant Police Officer JULIO VASQUEZ (hereinafter "P.O. Vasquez"), at all times herein, was employed by the NYPD at the 109th Police Precinct.

16.     That at all times herein mentioned, defendant P.O. Vasquez was acting within the course and scope of his employment with defendant City and the NYPD.

17.     That at all times herein mentioned, defendant P.O. Vasquez was acting under color of state law.

18.     Defendant P.O. Vasquez is sued herein in both his individual and official capacities.

19.     The following BWC videos from the body worn camera of P.O. Vasquez are identified by counsel as "**CONFIDENTIAL - 2019-04-13_21-40-00_POM_VASQUEZ,_JULIO_(918603).AVI**" and "**CONFIDENTIAL - 2019-04-13_21-42-20_POM_VASQUEZ,_JULIO_(918603).AVI.**"

20.     Defendant Police Officer ELVIN MERA (hereinafter "P.O. Mera"), at all times herein, was employed by the NYPD at the 109th Police Precinct.

21.     That at all times herein mentioned, defendant P.O. Mera was acting within the course and scope of his employment with defendant City and the NYPD.

22.     That at all times herein mentioned, defendant P.O. Mera was acting under color of state law.

23.     Defendant P.O. Mera is sued herein in both his individual and official capacities.

24.     The following BWC video from the body worn camera of P.O. Mera is identified by counsel as "**CONFIDENTIAL - 2019-04-13_21-44-00_POM_MERA,_ELVIN_(953104).AVI.**"

25.     Defendant Police Officer MICHAEL BONGIORNO (hereinafter "P.O. Bongiorno"), at all times herein, was employed by the NYPD at the 109th Police Precinct.

26.     That at all times herein mentioned, defendant P.O. Bongiorno was acting within the course and scope of his employment with defendant City and the NYPD.

27.     That at all times herein mentioned, defendant P.O. Bongiorno was acting under color of state law.

28.     Defendant P.O. Bongiorno is sued herein in both his individual and official capacities.

29.     The following BWC video from the body worn camera of P.O. Bongiorno is identified by counsel as "**CONFIDENTIAL - 2019-04-13_21-48-24.AVI.**"

30.     Defendant Police Officer "ARIELLE GIGANTE" (hereinafter "P.O. Gigante"), at all times herein, was employed by the NYPD at the 109th Police Precinct.

31.     That at all times herein mentioned, defendant P.O. Gigante was acting within the course and scope of her employment with defendant City and the NYPD.

32.     That at all times herein mentioned, defendant P.O. Gigante was acting under color of state law.

33.     Defendant P.O. Gigante is sued herein in both her individual and official capacities.

34      The following BWC videos from the body worn camera of P.O. Gigante are identified by counsel as **"CONFIDENTIAL- 2019-04-13_21-29-26.AVI"** and **"CONFIDENTIAL - 2019-04-13_21-42-24.AVI."**

35.     Defendant Police Officer "LISA ZEPPETELLI" (hereinafter "P.O. Zeppetelli"), at all times herein, was employed by the NYPD at the 109th Police Precinct.

36.     That at all times herein mentioned, defendant P.O. Zeppetelli was acting within the course and scope of her employment with defendant City and the NYPD.

37.     That at all times herein mentioned, defendant P.O. Zeppetelli was acting under color of state law.

38.     Defendant P.O. Zeppetelli is sued herein in both her individual and official capacities.

39      The following BWC videos from the body worn camera of P.O. Zeppetelli are identified by counsel as **"CONFIDENTIAL - 2019-04-13_21-29-26-2.AVI"** and "**CONFIDENTIAL - 2019-04-13_21-42-22.AVI**."

40.     No other file numbers or identifiers were provided for the above videos, which may be deficiencies.

### STATEMENT OF FACTS

41.     The facts stated in this Complaint are based, *inter alia*, upon the personal knowledge of plaintiff regarding events in which she was directly involved and "upon information and belief."  The sources of "upon information and belief" factual statements are either from pure observations of the plaintiff based upon her own personal knowledge or are derived from documents from the underlying criminal

prosecution or public documents from public sources.  In addition, facts have been drawn from the BWC videos turned over by the City of New York on 09/21/2021.  These sources may be incomplete.  The First Amended Complaint is of necessity drawn without the benefit of full discovery proceedings.

### EVENTS LEADING TO PLAINTIFF'S ARREST

42.      Plaintiff restates and realleges the allegations contained in Paragraphs "1" through "41" above as if set forth more fully herein.

43.     Plaintiff married Xueyuan He ("husband" and "ex-husband") on December 26, 2010.  They had one son, named Steve He, born in 2012 ("Steve" or "plaintiff's child").

44.     Steve showed a learning disability at an early age and was unable to speak (he was mute).

45.     Marital difficulties arose and the parties were divorced in a "no-fault" divorce proceeding by a judgment of divorce in Queens County dated September 2018 entered October 2018.

46.     Because of low income and lack of a suitable place to raise the child, plaintiff conceded custody to her ex-husband, but the settlement agreement and divorce judgment provided: "Defendant shall have reasonable rights of visitation with the children [sic]."  (Taken from the divorce judgment; only one child.)

47.     Plaintiff resolved that, once she became a citizen, she would sponsor her parents to immigrate, so they could help her care for Steve.  (At the time of the events herein, plaintiff only had a green card, but has since become naturalized; she will sponsor her parents.)

48.     The now ex-husband subsequently remarried and had another child and, although having custody of Steve, was not enthusiastic about having Steve reside with him, because of the ex-husband's new family.

49.     The ex-husband moved to Connecticut, where he started a small business.

50.     Plaintiff, who lived in New York, would drive to Connecticut and have regular visitation with her son on Tuesdays each week.  Sometimes, on weekends, she would go to the house of her ex-in-laws in

Queens to pick up her son for an extra weekend visit.  The arrangement was routine and harmonious

51.     Unbeknownst to the plaintiff, the ex-husband's brother had begun ferrying the child back and forth from Connecticut to Queens because he had started a massage parlor business and had to move the women workers back and forth, acting as their transportation.   In addition, the child's father was frequently unavailable for the child.  The child accompanied the ex-brother regularly on certain days, something of which the plaintiff was unaware because the husband had custody of plaintiff's child.

52.     On Tuesday, April 9, 2019, plaintiff called to set up her usual visit in the morning, but the ex-husband would not take her calls and answer the phone.

53.     Plaintiff, concerned, drove to Connecticut, and called the ex-husband from the McDonald's where the ex-husband usually dropped off the child.  Finally, the husband answered the phone and said he would bring Steve to the McDonald's.

54.     When the ex-husband arrived at the McDonald's, plaintiff saw that Steve had a black eye and bruising on one side of his face.  The child, due to his disability, could not tell the plaintiff what had happened to him.  Plaintiff was very upset and asked how that injury could have happened to Steve.  The ex-husband stated his brother was in a car accident and the child had been injured.  Plaintiff was very upset that the ex-husband had not told her.  The ex-husband became angry and left with the boy.

55.     Plaintiff called the ex-husband later and he told plaintiff she could go to his parents—the ex-in-laws—on Saturday, April 13, 2019, to see the boy, as she had many times.  Plaintiff, still upset, agreed.

56.     On Saturday, April 13, 2019, plaintiff called her ex-husband, who stated plaintiff should go to his parents' apartment because Steve was there.   The parents of the ex-husband/grandparents of Steve resided at 140-16 34th Avenue, Apt. 406, Flushing, New York, the residence of Xianjiu He ("He residence").

57.     For a long time, the ex-husband had lived in Queens, much of that time with plaintiff.  It was a

usual occurrence for plaintiff to pick up her child from the ex-in-laws/grandparents of Steve both before and after the divorce.  Plaintiff would go to the grandparents' apartment or, more commonly, she would call the grandparents and the grandmother, Li Sheng Ai, who would bring Steve downstairs to plaintiff.

58.     The grandparents would sometimes babysit the children of other families for extra money, so they were used to people coming and going from their apartment.

59.     On Saturday, April 13, 2019, plaintiff called the ex-in-laws/grandparents, but they would not answer the phone.  She called again from downstairs in the grandparents' building.  Residents in the building were used to seeing plaintiff, so they paid her no mind.  She routinely picked up the boy in the lobby when his grandmother brought him downstairs.  The ex-husband had told plaintiff to go there.

60.     Plaintiff believes the ex-in-laws/grandparents did not answer the phone because they knew plaintiff would still be upset when she saw the injuries to Steve's face.

61.     Unable to reach the ex-in-laws by phone, plaintiff went up to their apartment.  This was not an unusual occurrence, but normally was not necessary because the grandparents would cooperate.  Unlike the plaintiff, the grandparents had no formal rights to being with the child, no custodial rights.

62.     Plaintiff knocked on the door.  When it opened, Steve rushed into plaintiff's arms.  Apparently, someone had told him his mother was coming.  (Recall, respectfully, he was mute.)

63.     Upon the mother and child reuniting, they both burst into tears.  Plaintiff saw the child still had a bruised, purplish marking on his face.  This all occurred within the doorway, not inside the apartment.

64.     The parents of the ex-husband/plaintiff's ex-in-laws became enraged at the emotional display.

65.     They roughly yanked the boy away from plaintiff, hurting him, causing him to cry more.  This sight upset the plaintiff who protested.

66.     At this point, the grandparents decided plaintiff must go and began to push her from the door.

When she resisted, the grandparents began to beat plaintiff all over her body, causing bruising that was very easy to observe afterward.   (Plaintiff was dressed up to see her son, wearing a red, silk dress.) During the scuffle, although plaintiff never hit the grandparents, plaintiff dropped her bag and phone.

67.     At the time of the incident, plaintiff weighed 92 pounds, while each paternal grandparent weighed, upon information and belief, in the realm of 150 pounds.   The grandfather appears to be a person of vigor in the videos.  Police records inaccurately state plaintiff weighed 110 pounds.   She was indisputably tiny.

68.     As the grandparents hit plaintiff and pushed her out the door, she cried out: "Help, police!"

69.     The grandparents slammed their door shut.

70.     Latinx neighbors, living in the apartment next door, said to plaintiff: "Do you need us to call the police?"   Plaintiff told the neighbors to call police.  She told them she wanted to get her bag and phone first.   The neighbors closed the door.

71.     Plaintiff knocked on the ex-in-laws' door, calling out that she wanted her bag.  The grandparents opened the door, threw her bag out and slammed the door.

72.     Plaintiff then knocked, calling for her phone.  The grandparents repeated the act, throwing out the phone on the floor.

73.     At about this time, somehow the ex-husband's brother, the one who had the accident that injured the boy, called 911.  It is unknown if he were in the grandparents' (his parents') apartment because the plaintiff never saw him.

74.     The plaintiff went into the stairwell and sat on the stairs at the end of the hall.  The apartment in question was on the fourth floor, so plaintiff was sitting in the fourth-floor stairwell.  She was deciding if she should call the police, but did not want further trouble, so she was confused.  She hesitated.  As someone who was never involved with the police, she was afraid to involve the police.  Plaintiff had heard

stories of the police doing some things that did not turn out to be right.  But plaintiff needed help.

75.     The foregoing was the exact status when a cohort of police appeared in the premises.

### THE POLICE ARRIVE ON THE SCENE AND QUESTION THE BROTHER OF THE EX-HUSBAND

76.     Plaintiff restates and realleges the allegations contained in Paragraphs "1" through "75" above as if set forth more fully herein.

### SERGEANT FERNANDEZ: 9:28:51 P.M. (VIDEO LABEL DIFFERS ON TIME)

77.     As set forth in the BWC videos, the police are seen in a group approaching the apartment door of the alleged complainant, grandfather He.  See, e.g., the video of Sergeant Fernandez, who leads a group of three (3) burly, white or light-skinned male officers to grandfather's door; there are two white, female cops unseen.  See **CONFIDENTIAL-2019-04-13_21-29-20_SGT_FERNANDEZ,_YAUDY_(943227).AVI**." (Runs 2 mins., 28 secs.; truncated.)   This video constitutes the entire police "investigation."

78.     The door is opened by the brother of plaintiff's ex-husband (as identified by plaintiff).  This person was responsible for the injury to the child through negligence—the car accident.  The brother, who speaks relatively good English, aggressively took charge of the conversation with Sergeant Fernandez.[2]

79.     The grandfather approaches.  He is silent because he speaks no English (per plaintiff).

80.     Immediately, the brother states the plaintiff, the "ex-wife," hit his father with an umbrella.   He picks up the umbrella to show the police, which is conveniently displayed nearby.  It is a man's umbrella.

81.     The police have brought no translator or interpreter, although the site of the alleged crime is in the middle of Flushing with an overwhelmingly Asian populace (mostly Chinese or Korean).  The police are also from the 109th Precinct, which is located in the heart of downtown Flushing, a large Chinatown.

82.     Since no police officer speaks Korean, the people in the apartment are talking freely to each other

---

[2] Plaintiff believes the brother steered the cops toward plaintiff to avoid them asking questions about the bruising on her son's face.  The He family kept her son away from the police in the video.  Plaintiff pointed this out to counsel, viewing the video.

in the video in their particular Korean dialect, while the police question the brother of the ex-husband.

83.     There are two adult males, three adult females and three children in the apartment.  (At about 9:40 p.m., an unidentified Korean male is seen with the family, but he is not there initially.)  Plaintiff says one of the children in the video is her son, Steve.  The people in the apartment keep Steve away from police.

84.     According to plaintiff, who understands the dialect of Korean being spoken by her ex-husband's family, the wife of the brother, who talks to the police in English, is saying to the family of the ex-husband in the video in Korean, contemporaneously in front of the police: "Just tell the police that she [plaintiff] hit [the grandfather] with the umbrella.  Just say that."  (This is a form of witness tampering.)

85.     The brother tells police plaintiff is in the "lobby," but means the stairwell.  He asks if the Sergeant wants her phone number.  Sergeant Fernandez says: "Not right now."  Although the brother refers to grandfather He as "my father," the Sergeant never once asks about the relationship or who the brother is.

86.     The brother says "just write down in the report that she doesn't live here . . . [.]'' The Sergeant within one minute of listening to the brother's story says: "Don't worry, she's going to get arrested."

87.     The brother keeps saying plaintiff came into the apartment and hit "her" (him) "a couple times" with the umbrella.  He is referring to plaintiff allegedly hitting the grandfather.

88.     Sergeant: "Why did this occur?  Why did she hit him?"  Brother: "Something like she's crazy, you know?"  (The grandfather smiles a fixed smile the entire time, as his son weaves the tale.)

89.     Brother then says: "My parents only take care of the baby."  His wife holds an unrelated baby near police, so the police could easily have assumed this was the baby the brother speaks of.  They never ask.

90.     Brother: "Her baby here, too.  But then says: "She never come to see his [her] baby."

91.     The brother describes visitation procedure: Ex-husband calls "his Mom," Li Sheng Ai, and Mom brings Steve down to the lobby.  (But, as stated above, this day Li Sheng Ai would not answer the phone.)

92.     Brother says: "But today, she just come and hit my father."  Sergeant: "Okay, good."  Then he tells dispatch: "No further units necessary," at the address.    One cop says: "She's not around anymore." Brother: "She's sitting two-three minutes ago in the lobby over there."  (He means stairwell.)

93.     That's the entire "investigation," lasting 2 minutes, 28 seconds.

94.     No male police officer BWC videos film for another 10-12 minutes.  Female cops' videos run.

95.     It must be remarked that Sgt. Fernandez has a litigation history for unlawful or controversial arrests: (a) Tyrek Willis v. City of New York, 14-cv-00968-JG-JO (EDNY) (P.O. Fernandez named defendant; settled); (b) Anders Lee v. City of New York, 14-cv-02526-ENV-LB (EDNY) (P.O. Fernandez named defendant; settled); (c) Rafael Peguero v. City of New York, Index No.  015010/2014 (Kings County Supreme Court) (named defendant; disposition unknown).

**POLICE OFFICERS GIGANTE AND ZEPPETELLI (9:28:56 P.M.; LABEL DIFFERS ON VIDEO)**

96.     Two female cops arrive behind Sgt. Fernandez but stay in the hall.  Sgt. Fernandez in the video never enters the apartment, only speaking from the doorway.   These two videos are labelled by the City:

 **"CONFIDENTIAL- 2019-04-13_21-29-26.AVI"** (P.O. Gigante);   **"CONFIDENTIAL - 2019-04-13_21-29-26-2.AVI"** (P.O. Zeppetelli).

97.     One male cop says on the P.O. Gigante video: "I don't think it's a DIR [domestic incident report]."

98.     P.O. Gigante's video is an echo of Sgt. Fernandez's video but placed back so some English is clear, heard from the hallway.  No Korean language can be heard because Sgt. Fernandez stands in the doorway, blocking sound, while P.O. Gigante stands behind in the hallway.  Sgt. Fernandez states: "Sounds good."

99.     A male cop says into his walkie-talkie: "It's a 24."  ("assignment completed") (in 2.25 minutes). As stated, the BWC video of P.O. Gigante is an echo of Sgt. Fernandez's sole male BWC video.  P.O. Gigante is not heard to speak, not only in this video, but in her later BWC video, except for a brief remark.

100.    P.O. Zeppetelli's video is more of the same.  She arrives on the scene to the left and slightly behind P.O. Gigante.  The female cops stay back as the burly male cops move toward the doorway.

101.    Two of the male cops agree it's not a domestic violence incident in the women's videos.

102.    P.O. Zeppetelli says: "It's a scrunchie."  Male cop looks mystified.  There is some laughter.

103.    The cops agree it's over.  However, they don't immediately turn to leave.

104.    No male cops, other than Sgt. Fernandez, at this point, have turned on their BWC recorders or none were disclosed.  Up to this point, no police ask for permission to enter the apartment and, as a result, they do not see Steve and his bruised face.  On a call for domestic violence, this is clear negligence.  The male cops comment among themselves that the call has not been for a domestic violence incident.

### Plaintiff Leaves Stairwell, Comes Back to Talk to the Police and Is Arrested

105.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" through "103" above as if set forth more fully herein.

106.    The first group of three (3) videos consist of two by female officers and one by Sgt. Fernandez.

107.    There is a pause between the next batch of videos of roughly ten (10) minutes before the next group of six (6) BWC videos begins.  Thus far, there have been no BWC videos recorded for male police officers from time of police arrival at about 9:28 p.m., April 13, 2019, to, after the gap, 9:40 p.m., April 13, 2019, a period of about twelve (12) minutes.  There is no explanation provided for this absence.

108.    During this interval, plaintiff, sitting in the stairwell at the end of the fourth-floor hallway, has heard the police.  She decides to come out to speak to the police and tell them what happened to her.

109.    She approaches the police and tells them who she is.   She is immediately handcuffed.  The sequence showing her approaching police and her sudden cuffing is not recorded on any video.  The next set of videos begin with plaintiff in the process of being handcuffed, showing extreme fear and shock.

110.    The first video that records, at 9:40:00 p.m, is that of P.O. Vasquez.  This video is identified as "**CONFIDENTIAL - 2019-04-13_21-40-00_POM_VASQUEZ,_JULIO_(918603).AVI.**"  The video only runs for fifty (50) seconds.

111.    Ten minutes after Sgt. Fernandez has apparently left, at about 9:39 p.m., P.O. Vasquez's BWC indicates he is taking a photo of the grandfather/ex-father-in-law's arm, apparently to support the claim the grandfather was hit by plaintiff.   (There is an indistinct mark on the man's arm.)  Another Korean man is in view, who was not seen in prior videos.  The man's identity is unknown, but he is speaking to P.O. Vasquez, although there is no sound and the man's voice is not heard.  The man walks back inside the apartment of the alleged complainant.

112.    Four BWC videos then come on roughly simultaneously, at 9:42-44 p.m.  They are:

(a)    9:42:20: P.O. Vasquez (7 minutes, 58 seconds):

"**CONFIDENTIAL - 2019-04-13_21-40-00_POM_VASQUEZ,_JULIO_(918603).AVI**"

(b)    9:42:22: P.O. Zeppetelli (6 minutes, 33 seconds):

"**CONFIDENTIAL - 2019-04-13_21-42-22.AVI." (possibly edited/truncated)**

(c)    9:43:24: P.O. Gigante (6 minutes, 35 seconds):

"**CONFIDENTIAL - 2019-04-13_21-42-24.AVI." (possibly edited/truncated)**

(d)    9:44:00: P.O. Mera (6 minutes, 25 seconds):

"**CONFIDENTIAL - 2019-04-13_21-44-00_POM_MERA,_ELVIN_(953104).AVI."**

(e)    It is unknown why the women's videos are marked differently from the males' videos.   It is possible that there has been some kind of truncation or editing of the female cops' videos.  The same unusual difference is seen in the earlier videos of the female cops, as well.

113.    The first sight seen, in P.O. Vasquez's video, is of a male cop's hands grabbing the plaintiff.

Missing is the fact plaintiff had walked from down the hall to talk to the police. Plaintiff told police she had been attacked and tried to show the police officers the extensive bruising all over her arms, legs, her body. The police would not listen to her. Plaintiff, losing the power over her English, keeps referring to her "hands," when she is trying to show bruising on her arms.

114.    The grandfather/ex-father-in-law is seen looking out the door of his apartment, satisfied, seeing that the police are accosting the plaintiff (seen in P.O. Vasquez's second video), instead of him.

115.    Plaintiff keeps trying to tell police: "They hit me," trying to show her injuries. The female cops seem to reassure her, while the male does not speak. She says: "Next door, they saw me. Two of them." (She is referring to the Latinx neighbors who offered to call the police.) The grandfather stands inside his doorway, watching the whole time. "Next door, they saw me. Two of them." (She keeps referring to the witnesses next door, but the police do not knock on the neighbors' door at any time throughout the exchange.) "They asked me: Do you need help?" She said she told the neighbors: "Please call police!"

116.    A male cop is apparently talking to Sgt. Fernandez. He says: "Yeah, she's back. She's under." (He means she's under arrest.) Plaintiff: "I come to see my son and they hit me." She tells the police: "See my hands and my hair." (She means her arms and head, as she explained later; it is a failure of language due to stress.) The female cops hold her to keep her calm. There is a male cop's voice: "You got her?" The cop talking on the walkie-talkie says: "Yeah." Plaintiff: "They hit me, not me." (She refers to the fact she was attacked, but she did not hit anybody.)

117.    P.O. Vasquez's video shows the police going back to the apartment to get the phone number of the brother, the one who speaks English in the videos. The police and grandfather stand less than five-six feet away from the plaintiff, who is being held by the two female police officers (Gigante/Zeppetelli).

118.    Plaintiff, cuffed and held by the police, says, indicating neighbors' apartment: "Please ask them.

They come outside.  They saw."  P.O. Vasquez says: "It doesn't matter.  You're under arrest.  You shouldn't hit him.  He's an old man."  Plaintiff immediately answers, compellingly: "No."  She says: "They hit me, see my hands, they push me from the door."  Cop: "Why you doing here?"  Plaintiff: "To see my son."  Then, P.O. Vasquez responds: "You have no visitation rights.  You have no reason to be here."  (There is no way that the cop could have known that or made that conclusion; in fact, he was wrong, as the plaintiff's divorce agreement gave the right and the ex-husband had given permission.)  P.O. Vasquez: "You gotta let them know you're coming here."  Plaintiff: "I spoke to my ex-husband."  Vasquez: "No, that's not what they say."  There is zero in the videos to support that claim.  Plaintiff: "I understand the law, but I come to see my son because my son had an accident."  She says her son has bruises "on face, all over face, I have a picture."  (Not at any time do the police ask to see the son in the apartment five-six feet away.)  Plaintiff: "It's so dark and I worry about my son.  I come to see my son."  She explains she has to work the next day, but she wanted to see her son.  She indicates she just wanted to see him and the grandparents just pushed her out and hit her.  Plaintiff: "And I say, why, why, why."  She says neighbors asked if she were okay; she told them no, but her phone was "in the apartment" and she could not call police.  (At that point, plaintiff's son runs into the hallway and the grandfather seizes him and returns him into the apartment; the police do not comment, do not ask anything about the boy.)  Plaintiff repeats again that the neighbors were witnesses.

119.    The police remove her.  She: "First time in my life [getting arrested]."  Cops: "It's okay."  She is walked down the hall to the elevator by the group of 4-5 police, as if she were a dangerous felon.   (In truth, some of the cops look sheepish.)  Plaintiff starts lamenting.  "They hit me.  Please ask next door."

120.    Plaintiff says to the cops in the elevator that she saw the cops come and she wanted to tell them what had happened, never expecting that she would be arrested.  She is clearly upset, terrified.

121.     She asks why she is being arrested.  P.O. Vasquez: "You have no business being here."  This ends the P.O. Vasquez video.  Vasquez is the cop who actually restrained and arrested plaintiff.

122.     Next in chronological sequence is P.O. Zeppetelli's video, which activated simultaneously with the BWC video of P.O. Vasquez, as the footage shows.  This video clearly shows the fear and terror in plaintiff's face as P.O. Vasquez seizes her and he handcuffs her.

123.     The Zeppetelli video is more or less an echo of Vasquez's video except there is much footage of closeups of terrified plaintiff's face (because Zeppetelli and Gigante are holding her), as she tells police about her son being in a car accident, about the grandparents hitting her, about the two neighbors as witnesses.  At one point in the video, P.O. Zeppetelli tells the male cops: "We are live, just so you know." (She is telling them her BWC video is running.)  She and Gigante hold plaintiff, as two of the male cops, Vasquez and Mera, go back into the apartment, ostensibly to get phone numbers.

124.     In the background, as Zeppetelli stands in the hallway with plaintiff, P.O. Mera can be seen in the apartment, talking with the English-speaking son of the grandfather, brother of the ex-husband.

125.     P.O. Zeppetelli's second BWC video is an excellent record of plaintiff in her anguish, fear and confusion at the police arresting her, but not listening to her.  Ironically, it is plaintiff whose English, though fractured, gives a clear account of what happened, not what the ex-husband's brother said.

126.     The video cuts off in the middle of a conversation between P.O. Zeppetelli and P.O. Gigantea about who "wants" the arrest, to write it up.   The exchange is cut off or deleted.

127.     Chronologically, a couple of seconds behind, P.O. Gigante's BWC video records, at about 9:42 p.m., as well.   Although the two female cops are holding plaintiff, P.O. Gigante's video shows P.O. Vasquez touching plaintiff's body or arm.  P.O. Vasquez then takes ahold of plaintiff's arm and holds her for the rest of the video into the elevator.  There appears to be no real purpose for this touching, as plaintiff

is handcuffed (by P.O. Vasquez) and held by two female cops who are far heftier than plaintiff.  Although seemingly unsympathetic to plaintiff, P.O. Vasquez wants to hold that arm.

128.    In the elevator, P.O. Mera says: "If anything, call the son."  (He means ex-husband's brother who spoke at length to Sgt. Fernandez, setting up the plaintiff for an arrest.)  The police, in the absence of an interpreter, never once interviewed the alleged "victim," the grandfather.  Nor did the police even acknowledge the presence of the grandfather's wife, the grandmother.

129.    One of the female cops is heard saying at the end of P.O. Gigante's video: "I just don't understand."   It is an emphatic statement, but the context is missing.

130.    The last video in the sequence of the four videos at 9:42-9:44 p.m. is that of P.O. Mera, who is seen coming from the elevator into the hallway, with the plaintiff and the other three cops: Vasquez, Gigante and Zeppetelli at the end of the hall near the grandfather's apartment.

131.    P.O. Mera goes into the apartment to fetch phone numbers from the He family (ex-husband's family).  P.O. Mera asks the brother if plaintiff works.  Brother lies and says he does not know.  (Plaintiff says ex-husband's family knows all about her job as a beautician.)  Then P.O. Mera asks if plaintiff drives.  The brother lies again.  He is well-aware that plaintiff drives to Connecticut to visit with her son, Steve.  Then, the brother tries to give P.O. Mera the phone number of plaintiff's ex-husband.  Cleverly, the brother has controlled the entire exchange with the pliable police.  Recall, respectfully, the brother is the operator of a massage parlor and drives the women workers back and forth to Connecticut.  This was how Steve, plaintiff's son, was injured.  The entire manufacture was meant to shield He's son from accountability.  This, of course, was of no concern to police.  But ex-husband's family would not have known this.

132.    P.O. Mera says to the ex-husband's brother: "I'll call you if anything, okay?"  The brother of the ex-husband is silent.  P.O. Mera says: "Fernandez is downstairs."  Really?  The question arises: Why

didn't Sgt. Fernandez come upstairs when plaintiff showed up and was arrested?  Sgt. Fernandez was the supervising officer and sanctioned the entire matter in 2 minutes, 28 seconds (in his video above).

133.    There's some talk in the elevator about who will take the arrest.

134.    The final video is that of P.O. Bongiorno:

**"CONFIDENTIAL - 2019-04-13_21-48-24.AVI"**

135.    This video is largely concerned with transport of plaintiff to the 109th Precinct, her processing there and her being placed in a cell.

136.    It is the longest BWC video at 14 minutes, 35 seconds.

137.    Plaintiff sits in the back of the police vehicle.  A male cop's voice indicates that "she" wants the arrest, which turns out to be P.O. Gigante, as set forth in the arrest documents.

138.    Plaintiff continues to talk about the fact the grandparents hit her and the two neighbors next door to the grandparents witnessed the altercation.  By this time, the police are no longer interested, as the arrest has been made and all that's left is to process plaintiff.  She tells them her son was in an accident and his face "is getting blue."  (She means black and blue.)   Cop asks: "What do you mean his face is getting blue?"  Plaintiff tells the police that the brother the police talked to had an accident and that is how her son was injured.  Police: "There's nothing we can do about a car accident."

139.    In this last video, plaintiff is processed in the Precinct.  Plaintiff tells police she has to work "tomorrow."  (She was ultimately fired from her second job, as she could not call.)   As plaintiff is being led to a cell, she asks: "Excuse me, I'm gonna get arrest?"  P.O. Bongiorno: "Yes, you are under arrest."  Plaintiff asks: "When can I be outside?"   Officer: "Don't know yet.  A couple hours."  As she sees the cells, she says: "Oh, my God.  I'm scared."  Cops say that plaintiff needs to calm down or she will have to

go to the hospital, threatening her with a "long day."   Plaintiff: "This is unfair."   She is placed in the cell without her boots because she is too upset to put them back on.   They are left by a chair.

140.   Later, plaintiff interacted with P.O. Gigante, who, in sum and substance said to plaintiff: "We know you didn't do anything, but once we 'cuff you, we have to arrest you and take you in."

141.   While at the Precinct the same female police officer, who had stated that they had to take plaintiff in after she was cuffed, came up to plaintiff and stated she was sorry, but plaintiff had to "go through the system" because that was how things were done.

142.   The same police officer told plaintiff that she was "sorry" many times, both at the time of arrest, then in the police station and then when plaintiff was taken outside to a police car to be taken to the Kew Gardens Courthouse for arraignment.   The officer followed plaintiff outside and said more than once that plaintiff could sue the City for what had happened to her and she would get "a lot of money."

143.   In spite of the fact plaintiff was the victim, plaintiff was arrested, charged and arraigned for the following charges: (a) NY Penal Law 120.00-1, Assault in the Third Degree with Intent to Cause Physical Inj. and (b) NY Penal Law 240.26-1, Harassment in the Second Degree, under docket CR-012031-19QN.

144.   All defendants agreed, cooperated, participated and conspired with their codefendants herein to assist in and effectuate plaintiff's unlawful arrest, detention and malicious prosecution for crimes they knew she did not commit and in so doing deprived plaintiff of the rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, her rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches and seizures and to be prosecuted without due process of law or probable cause.

145   Following the arrest, plaintiff underwent prosecution.   However, the undersigned attorney called the Queens County District Attorney's Office and on May 15, 2019, the case was dismissed prior to the

plaintiff's first appearance, acknowledging the baseless arrest without probable cause.

146.    Since this incident, plaintiff is very afraid now of the police.  She has problems sleeping and is very nervous as a result.  Anyone could see from her bruises she had been a victim.  Defendant has been seeking therapy in connection with the fears that she endured for this unlawful arrest and prosecution.

147.    Plaintiff was fired from her second job as she had no chance to call.

148.    The amount of damages sought in this action exceeds the jurisdictional limits of all lower Courts that might otherwise have jurisdiction.

## FIRST CLAIM AGAINST ALL DEFENDANTS

### (False Arrest/Detainer Claim Under 42 U.S.C. § 1983)

149.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "148" above as if set forth more fully herein.

150.    All defendants, as enumerated in the caption, while acting in concert and, upon information and belief, within the scope of their employment and authority, and without a warrant, seized plaintiff, forcibly put plaintiff into handcuffs in spite of her visible bruises, placed plaintiff under arrest without any reasonable cause to believe that plaintiff had committed, was committing or was about to commit any offense, and caused plaintiff to be detained at two places, and thereby deprived plaintiff of her rights, liberties and freedoms under the color of state law, including plaintiff's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

151.    All defendants, without doing more than a 2 minute, 28 second investigation, assigned blame without probable cause to plaintiff, acting in concert to assess culpability, as based upon the video evidence incorporated by reference into the complaint.  Sergeant Yaudy Fernandez, supervisor, personally took charge and interviewed the brother of plaintiff's ex-husband, who was hiding the fact that he caused

an injury to plaintiff's son and adopted the brother's story without proper inquiry.  There were no grounds to accept what this person said, as his relationship to the incidents and the parties was not even established by Sergeant Fernandez, who acted suspiciously in that, after his 2.50-minute investigation, he absented himself from the scene, permitting the arrest of plaintiff without further inquiry.  In fact, it appears that Sergeant Fernandez phoned in his approval and assent to plaintiff's arrest without probable cause.

152.    Police Officer Vasquez was presented with a clear and unequivocal story by plaintiff of what had happened to her, something P.O. Vasquez had an obligation to investigate.  In fact, plaintiff identified two readily available non-party witnesses, the neighbors adjacent to the scene of the altercation, and police, in particular Police Officers Vasquez, Mera, Gigante and Zeppetelli failed to interview them or inquire.

153.    It's true that the police never used an interpreter to question plaintiff.  The police never questioned plaintiff at all with or without an interpreter.  Instead, they only questioned the son of the ex-husband's father, without even questioning the alleged victim himself, who spoke a dialect of Korean and no English. In spite of failing to question the victim, the police falsely alleged certain acts against the plaintiff, placing perjurious statements into a criminal complaint, which was a violation of their public office and positions as officers of the law.  The false swearing alone, which was certified by P.O. Gigante, was a form of misdemeanor: the complaint alleged complainant spoke to police, in particular P.O. Gigante, which never occurred. No mention is made in the complaint of the only person with whom the police spoke—the brother of plaintiff's ex-husband.

154.  The First Claim is alleged against all defendants, in particular Sergeant Fernandez, Police Officer Vasquez and Police Officer Gigante, who made the false swearing.

155.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

## SECOND CLAIM AGAINST ALL DEFENDANTS

### (Malicious Prosecution Claim Under 42 U.S.C. § 1983)

156.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to 155" above as if set forth more fully herein.

157.    Defendants, acting in concert and, upon information and belief, within the scope of their employment and authority, caused plaintiff to be prosecuted with malice and without probable cause—a prosecution terminated in plaintiff's favor—in violation of plaintiff's right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

158.    Plaintiff's prosecution was discontinued by the District Attorney of Queens County, which was a favorable action in plaintiff's favor.  It is falsely claimed that the case was dismissed as the result of the speedy trial statute and failure of the complainant to cooperate, when clearly it was the correct, positive action of responsible supervising prosecutors in the Office of the Queens District Attorney, who, upon the defects in the case being brought to their attention, determined to dismiss the case against plaintiff.

159.    This claim is brought against all defendants.

160.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

## THIRD CLAIM AGAINST ALL DEFENDANTS

### (Malicious Abuse of Process Claim Under 42 U.S.C. § 1983)

161.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "160" above as if set forth more fully herein.

162.    Defendants, acting in concert and, upon information and belief, within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm plaintiff

without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside legitimate ends of the process. Such collateral objective included, but was not limited to, covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification or probable cause.

163.    Specifically, false allegations were made in a criminal complaint that were not the product of any complaint by a person who could express himself in English. In fact, as shown in BWC videos, there wasn't even any interview of the alleged complainant who spoke no English.

164.    The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and that by virtue of the aforementioned acts, plaintiff was deprived of her rights, privileges and immunities secured by the Constitution of the United States, including her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law or prosecution only under probable cause.

165.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

**FOURTH CLAIM AGAINST ALL DEFENDANTS**

**(Failure to Intervene Claim Under 42 U.S.C. § 1983)**

166.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "165" above as if set forth more fully herein.

167.    Each individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendants' presence by other defendants, but failed to intervene to prevent unlawful conduct, despite having had a realistic opportunity to do so, in violations of plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution.

168.    In particular, defendants P.O. Vasquez, P.O. Gigante and P.O. Zeppetelli heard and were witness to

statements of plaintiff that should have caused them to intervene and halt plaintiff's arrest.  Instead the three officers stood by and did nothing, leading to the tortious abuse of plaintiff by the defendants.

169.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

### FIFTH CLAIM AGAINST ALL DEFENDANTS

### (Conspiracy Claim Under 42 U.S.C. § 1983)

170.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "169" above as if set forth more fully herein.

171.    Defendants agreed, cooperated, participated and conspired to assist in and effectuate plaintiff's unlawful arrest, detainer and malicious prosecution for crimes she did not commit, and in so doing deprived plaintiff of her rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law.

172.    Aware that plaintiff was most probably innocent of any criminal conduct, which conduct wasn't even expressed by any officer, so that plaintiff would be aware of why she was being arrested, the officers present, Sergeant Fernandez, who ordered the arrest, P.O. Vasquez, P.O. Mera, P.O. Gigante and P.O. Zeppettelli, in effect joined with the alleged victim, Xianjiu He, and his family to conspire and act in concert to effectuate the false arrest and detention of the plaintiff, causing her emotional pain, suffering, deprivation of liberty and loss of income due to losing a job from the resulting arrest.

173.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

### SIXTH CLAIM AGAINST ALL DEFENDANTS

### (Violation of Due Process Claim Under 42 U.S.C. § 1983)

174.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "173" above as if set

forth more fully herein.

175.    By the conduct and actions described above, defendants while engaged under color of state law, conspired to interfere with and violate rights secured to plaintiff by the Constitution of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, plaintiff's Fourth, Sixth and Fourteenth Amendment rights.

176.    Defendants, through the actions alleged above, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain a conviction against plaintiff at all costs.

177.    By refusing to question plaintiff about the facts and to adhere to a false narrative more or less created by Sergeant Fernandez, which he borrowed from the brother of the plaintiff's ex-husband without responsibly investigating actual facts, defendant P.O. Gigante, who signed the false swearing in the Complaint, and all officers present, P.O. Vasquez, who unreasonably restrained plaintiff, plus P.O. Officers Mera and Zeppetteli, joined in to deprive plaintiff of her right to due process.

178.    P.O. Bongiorno, on his way to the 109th Precinct, was given facts from the plaintiff that should have given him cause to reconsider the circumstances of the arrest but dismissed the facts by claiming that the police had no authority over a traffic accident, making him an accomplice in the deprivation of rights.

179.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

## SEVENTH CLAIM AGAINST ALL DEFENDANTS

### (Municipal Liability "Monell" Claim Under 42 U.S.C. § 1983)

180.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "179" above as if set forth more fully herein.

181.    The individual defendants, singly and collectively, while acting within the scope of their

employment and authority, upon information and belief, and under color of state law, engaged in conduct that constituted customs, policies, practices, procedures, rules or usages of the NYPD and its officers and their specific precinct(s) forbidden by the Constitution of the United States, under <u>Monell v. Dept. of Soc. Servs. of N.Y.</u>, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978).

182.    As shown in the BWC videos, the arrest of the plaintiff was either the product of incompetence or corruption.    As corruption (a "shakedown") can only be inferred, due to the absence of Sergeant Fernandez at the time plaintiff was arrested, and the presence of a mysterious person in the apartment whose identity is not disclosed, then the only direct evidence demonstrates that the 2 minute, 28 second investigation was the fruit of the incompetence of Sergeant Fernandez, as assisted primarily by P.O. Vasquez and P.O. Mera.  Certainly, there was no true investigation of any facts, as the alleged victim was not even interviewed, being that he could not communicate in English and Sergeant Fernandez and his group did not provide an interpreter.  Additionally, plaintiff pointed to viable non-party witnesses within easy reach of a police investigation, with whom the police did not engage in inquiry.  Finally, members of the He family were talking in Korean right in front of Sergeant Fernandez, conspiring to create a false story, relying on Fernandez's lack of Korean language skills to manipulate him.

183.    All of the foregoing speaks to a deficit of training and understanding of the role of law enforcement as responsible investigators of facts in order to justly enforce the legislated laws.

184.    The foregoing customs, policies, practices, procedures, rules and usages include, but are not limited to, making arrests without probable cause, initiating and continuing prosecutions without probable cause, and committing perjury.  This includes, without limitation, as practices of defendant City and NYPD:

(a.)    police officers, more or less, randomly assigning roles of perpetrator and victim to parties when responding to a call to a scene of crime or mayhem;

(b.)    failure of responding officers to properly assess facts at a scene, failing to properly locate and assess evidence in connection with claims of parties at scene;

(c.)    officers at the scene of a call failing to employ qualified language interpreters;

(d.)    practice of police officers to forge ahead with an arrest once a suspect is handcuffed; and

(e.)    defendants City and NYPD having notice of the deficits of the foregoing, failing to curb or control the use of said practices.

185.    The abuse to which plaintiff was subjected was consistent with an institutionalized practice of defendant NYPD, which is known and ratified by defendant City.

186.    Despite knowledge of these institutionalized practices, defendant City has at no time taken any effective action to prevent NYPD personnel from continuing to engage in this type of misconduct.

187.    The failure of defendant City to properly train defendants included the failure to instruct them in applicable provisions of the State Penal Law of the State of New York, federal and state constitutional limitations and the proper and prudent use of force.

188.    Defendant City authorized, tolerated as institutionalized practices and ratified the misconduct detailed above by, among other things:

(a.)    failing to properly discipline, train, restrict and control employees, including defendants, known to be irresponsible in their dealings with citizens of the community;

(b.)    failing to take adequate precautions in the training, hiring, promotion and retention of police personnel, including specifically defendants herein;

(c.)    failing to forward to the offices of Queens DA evidence of criminal acts committed by police personnel;

(d.)    failing to establish or assure the functioning of a bona fide and meaningful departmental system for

dealing with complaints of police misconduct, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public; and

(e.)     that failure to supervise and/or train by defendant City of defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, *inter alia*, plaintiff's Fourth and Fourteenth Amendment rights.

189.    The NYPD has inadequately screened, hired, retained, trained and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom NYPD police officers come into contact.

190.    The foregoing customs, policies, practices, procedures, rules and usages constituted deliberate indifference to plaintiff's safety, well-being and constitutional rights.

191.    The foregoing customs, policies, practices, procedures, rules or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff.

192.    The foregoing customs, policies, practices, procedures, rules or usages were the moving force behind the constitutional violations suffered by plaintiff.

193.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

### EIGHTH CLAIM AGAINST ALL DEFENDANTS

### (VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE NEW YORK STATE CONSTITUTION)

194.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "193" above as if set forth more fully herein

195.    Defendants, acting in concert and, upon information and belief, within the scope of their employment and authority violated plaintiff's right to be free of unreasonable and unlawful searches and

seizures under Article I, § 12 of the New York State Constitution.

196.    Defendants, acting in concert and, upon information and belief, within the scope of their employment and authority, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain an unjust conviction against plaintiff.

197.    Upon information and belief, this included a course of conduct and patter of behavior whereby defendants, *inter alia*, created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had committed one or more offenses, intentionally and maliciously concealed material exculpatory evidence and unduly influenced the statements and testimony of witnesses by means of coercion, violence or deceit.

198.    That by virtue of the aforementioned acts, defendants deprived plaintiff of her liberty and property without due process of law, in contravention of Article I, § 6 of the New York State Constitution.

199.    Defendant City is also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants and/or employees under the doctrine of *respondeat superior.*

200.    Wherefore, plaintiff demands judgment in the sum of $150,000.00.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands the following relief jointly and severally against all the defendants:

(a.)    Compensatory damages in an amount to be determined at trial;

(b.)    Punitive damages in an amount to be determined at trial;

(c.)    Attorney's fees pursuant to 42 U.S.C. § 1988;

(d.)    An award of plaintiff's costs of suit;

(e.)    Pre-judgment and post-judgment interest;

(f.)     An award of the foregoing of no less than $150,000.00, as estimated by plaintiff; and

(g.)     Such other and further relief as this Court deems just and proper.

Dated:         October 18, 2021

**_Michael R. Curran /s/_**
Michael R. Curran
Attorney at Law
36-09 Main Street
Suite 9B-2
Flushing, New York 11354
(347) 549-2079 (cell-pandemic)
(718) 830-7741 (tel.)
mrc4law@yahoo.com

**_Attorney for Plaintiff_**