UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
GUO HUA JIN,

        Plaintiff,         **MEMORANDUM OPINION**
                                 Case No. 20-CV-3603

  -against-

THE CITY OF NEW YORK, et al.,

        Defendants.
------------------------------------------------x

*Appearances*:

| For the Plaintiff: | For the Defendants: |
|---|---|
| MICHAEL R. CURRAN | ZACHARY KALMBACH |
| Michael R. Curran, Attorney at Law | New York City Law Department |
| 36-09 Main St. | 100 Church Street |
| Suite 9B-2 | Suite 3-228 |
| Flushing, NY 11354 | New York, NY 10007 |

**BLOCK, Senior District Judge:**

    Plaintiff Guo Hua Jin ("Plaintiff" or "Jin") brings a § 1983 action against the City of New York ("City") and six New York Police Department ("NYPD") officers, Sergeant Yaudy Fernandez, Officer Julio Vasquez, Officer Elvin Mera, Officer Michael Bongiorno, Officer Arielle Gigante, and Officer Lisa Zeppetelli (the "Officers"). Jin alleges several claims arising out of an incident that occurred on the evening of April 13, 2019 which resulted in her arrest. The City and the Officers (together, "Defendants") have moved for summary judgment under Federal Rule of

1

Civil Procedure 56(a) as to all claims. For the reasons that follow, the Court grants Defendants' motion except as to Jin's false arrest claim.

## I.     FACTS

The following facts are taken from the pleadings, the parties' Rule 56.1 statements, and supporting documentation. They are undisputed unless otherwise noted.

At approximately 9:09 p.m.[1] on April 13, 2019, the NYPD received a 911 call reporting a domestic violence incident at an apartment located at 140-16 34th Avenue in Queens. The male caller indicated that his brother's ex-wife had come to an apartment at the aforementioned address, pushed her way in, and hit his father. Sergeant Fernandez and Officers Gigante, Zeppetelli, Vasquez, Mera, and Bongiorno arrived at the scene approximately twenty minutes later. As they approached the apartment, Sergeant Fernandez turned on his body-worn camera ("BWC") to record the Officers' initial interaction with the complaining victim (the "Complainant") and his son.

Upon the Officers' arrival at the apartment, the Complainant's son answered the door and began speaking with them. As is apparent from the BWC footage, the

---

[1] Plaintiff contests the time of the 911 call, arguing that it was made at approximately 9:18 p.m. However, the Intergraph Computer Aided Dispatch ("ICAD") report submitted to the court as Defendant's Exhibit B appears to show the 911 call was received at 9:09 p.m., and it is unclear why Plaintiff disputes this.

2

Complainant did not speak to the Officers, since he apparently does not speak English. The Officers did not call a translator, but instead relied on the Complainant's son, who Officers appear to assume was the 911-caller. However, Jin asserts that the phone number from which the 911 call was placed is connected to a landline at another address, suggesting that either the caller was not present at the scene during the incident, or the son who answered the door may not have been the 911-caller. Whether the Officers asked the son if he was present at the time of the incident is not apparent from the BWC footage nor the remainder of the record.

    The audio in the BWC footage commences when the Complainant approaches the Officers and points to an area on the inside of his arm near his elbow crease. A scratch is visible and one of the Officers asks him "Who did that?" The son responds that it was his brother's ex-wife, Jin, and the Complainant picks up an umbrella and pantomimes hitting his arm with the object. The son tells the Officers something to the effect of, "I just want to write down a report to just let her… don't bother my father, my parents anymore," to which Sergeant Fernandez responds, "We'll she's going to get arrested." This occurs at approximately minute 1:02 of the video and less than a minute into the Officers' interaction with the Complainant and his son.

    The son then tells the Officers that Jin hit the Complainant with the umbrella, and Sergeant Fernandez asks why, to which the son replies, perhaps because she is crazy. The Complainant's son goes on to explain that his parents take care of Jin's

3

baby, who is in the apartment, and that Jin sometimes meets his mother in the lobby of the building to visit her son. Shortly thereafter, the BWC footage concludes.[2]

Jin, who was waiting in a stairwell near the apartment when the Officers arrived, apparently approached them at some point when they were speaking with the Complainant's son. Another BWC video shows Jin's subsequent arrest. In the footage, she is heard telling Officers that she was hit. When the Officers do not respond, she continues in broken English, "The next door, they saw me, two of them, people…next door, can you ask them? They saw me." Officer Gigante responds, "Not right now, just wait." Jin repeats herself, adding that the people next door asked her if she needed help, that she told them to call the police, and that her son had an injury.

She goes on to point out apparent injuries on herself as a result of being struck, and again says, "They hit me—not me." She reiterates that the people next door witnessed the incident and asks Sergeant Fernandez to speak with them. He responds "It doesn't matter. You're under arrest. You shouldn't have been hitting him, the old man." Jin again contests, saying that she was hit and pushed out the front door, and goes on to explain that she was worried abut her son because he had an accident, so

---

[2] Another BWC video submitted to the Court as Defendant's Exhibit D, which is footage from Officer Gigante's BWC, shows the same interaction. Footage from Officer Vasquez's BWC submitted to the Court as Defendant's Exhibit E, which is time-stamped beginning at approximately 9:39 p.m., shows Officer Vasquez photographing apparent injuries to the Complainant's arm.

...
...
...

she came to see him, but people in the apartment pushed her out. She reiterates that the people next door asked her if she was okay and pleads with the Officers to "please ask" them as she is escorted out of the building.

As a result of the incident, Jin was charged with assault in the third degree, in violation of New York Penal Law § 120.05, and harassment in the second degree, in violation of New York Penal Law § 240.26. She was arraigned on April 14, 2019 and released. The case was dismissed on May 15, 2019. On August 10, 2020, Jin filed a complaint in this Court against the Officers and the City as a result of the incident. She has since amended her complaint twice, and now, Defendants move for summary judgment as to all claims.

## II. SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue as to any material fact exists and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "The burden is on the moving party to establish the absence of any material fact issues." *Terry v. Ashcroft*, 336 F. 3d 128, 137 (2d Cir. 2003). The Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought" when making this determination. *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F. 3d 305, 312 (2d Cir. 2001).

### III. DISCUSSION

Jin asserts claims for (i) false arrest, (ii) malicious prosecution, (iii) malicious abuse of process, (iv) failure to intervene, (v) conspiracy, (vi) violation of due process, (vii) *Monell* liability, and (viii) violations of the New York State Constitution. The Court first addresses the false arrest claim, then addresses all other claims together.

**A. False Arrest Claim**

To succeed on a claim for false arrest under 42 U.S.C. § 1983, Jin must show: (i) the Defendants intentionally arrested her, (ii) she was conscious of the arrest, (iii) she did not consent to the arrest, and (iv) the arrest was not supported by probable cause. *Singer v. Fulton County Sheriff*, 63 F. 3d 110, 188 (2d Cir. 1995). Therefore, Probable cause is an absolute defense to a false arrest claim. *Id*. at 118-19. It is also the only point disputed between the parties.

A finding of qualified immunity also bars a false arrest claim against an officer. To find that an officer is entitled to qualified immunity, the Court need only find that an officer had "arguable probable cause" to make the arrest in question. *Escalera v. Lunn*, 361 F.3d 737, 742 (2d Cir. 2004). Unlike probable cause "in fact" that exists if the "facts and circumstances" known to police "are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed," *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007), "arguable"

probable cause exists so long as "officers of reasonable competence *could disagree* on whether the probable cause test was met." *Escalera*, 361 F.3d at 742 (emphasis added). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004).

To determine if the Officers had arguable probable cause to arrest Jin, the Court must assess the facts known to the Officers at the time of her arrest. These facts were: (i) that a 911 call had been placed to report a domestic incident, (ii) the account relayed by the Complainant's son's of Jin hitting his father with an umbrella, and (iii) the scratch visible on the Complainant's arm. Had these facts occurred under differing circumstances, a probable cause determination may have been more certain. However, the facts must be considered in their context—a purported domestic violence incident.

Defendants cite *Carty v. City of New York* for the proposition that probable cause exists when arresting officers make their finding based on information that comes from an eyewitness or putative victim, "'unless the circumstances raise doubt as to the person's veracity.'" No. 16-CV-1294, 2019 WL 1428368, at *2 (E.D.N.Y. March 29, 2019) (quoting *Curly v. Vill. of Suffern*, 268 F. 3d 65, 70 (2d Cir. 2001)). In *Carty*, the probable cause determination was made based on information given to the arresting officer just after a food cart owner had been robbed by two men who

7

told him that they were armed, followed by a positive identification of the purported assailants by the food cart owner. Under these circumstances, the arresting officer correctly determined that there was probable cause based on an eyewitness identification by the victim of a crime whose veracity the officer had no reason to question. But that is not the scenario before the Court.

Here, the account of what transpired between Jin and her ex-father-in-law was not relayed to Officers by the victim of the crime or by an otherwise unbiased eyewitness. First, it is not clear that the Complainant's son witnessed this event at all. Whoever called 911 appears to have done so from a landline at a different address, so either the person who called 911 was not the son who spoke with the Officers on the scene, or he traveled to the scene from another location. It is unclear whether Officers knew this at the time.

Second, even if the Complainant's had been an eyewitness to the incident, there is no reason for the Officers to assume that he was an unbiased, credible source of information or translator, given the relational dynamic between him and his father and Jin. Common sense dictates that the victim-perpetrator dynamic typical in many other crimes is not always as clear-cut in a domestic dispute incident. And, since Jin contradicted the Complainant's son's account and claimed herself to be the victim in the incident, the Officers had further reason to potentially discredit the son's account.

Finally, although an arresting officer is under no obligation to ferret out reasons to disbelieve a complaining witness, *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997), it is not clear that when presented with significant reasons to potentially discredit that witness, they may simply ignore them. In particular, since potentially unbiased third-party witnesses to the incident who could have confirmed either Jin's or the Complainant's account were available just next door, it cannot be said that a reasonable officer would not have sought to speak with them.

"[S]ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007). Here, it is not clear that the undisputed facts as they are known to the Court support finding that the Officers' probable cause determination was objectively reasonable. Would a reasonable officer have declined to seek more information before arresting Jin, including knocking on the neighbors' door to inquire about what they saw? This question is best left to a jury to determine. Nor can qualified immunity attach at this stage of litigation because of the factual discrepancies mentioned herein. Therefore, the Defendant's summary judgment motion as to the false arrest claim is denied.

## B. All Other Claims

Jin's response to the Defendants' motion for summary judgement focuses entirely on the probable cause and qualified immunity analyses. As explained above, Jin succeeds in poking holes in the probable cause determination. However, she fails to address any of Defendants' alternative arguments as to each claim other than false arrest. Because Defendants have offered sound alternative bases upon which to dismiss Jin's other claims, the Court deems them abandoned. *See Rohn Padmore, Inc. v. LC Play Inc.*, 679 F.Supp.2d 454, 459 (S.D.N.Y. 2010) ("Where one party fails to respond to an opposing party's argument that its claim must be dismissed, courts may exercise their discretion and deem the claim abandoned." (Citation omitted)).

Had Jin not abandoned these claims, the Court would still dismiss them. First, Jin has made no showing of actual malice, which is required for a malicious prosecution claim, *see Manganiello v. City of New York*, 612 F. 3d 149, 160-61 (2d Cir. 2010), nor has she shown that Defendants intended to harm her, as is required by a malicious abuse of process claim. *See Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003). Her failure to intervene claim, which she has alleged against all individual Defendants, cannot succeed because she has also alleged false arrest against all Defendants: "a defendant cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from

10

committing that violation." *Case v. City of New York*, 223 F. Supp. 3d 372, 401 (S.D.N.Y. Feb. 10, 2017) (alteration in original) (quotation omitted). Jin has also failed to make any showing that the Officers made an agreement to act in concert to injure her, as is required for a claim of conspiracy in violation of 42 U.S.C. § 1983. *See Nat'l Cong. For Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 168 (S.D.N.Y. Oct 20, 1999) ("Thus, where a conspiracy claim is conclusory and fails to allege facts which suggest an agreement among the parties, the complaint must be dismissed.").

The same is true of her due process claim, which, despite its labeling, is constructed more like a combination of a false arrest and malicious prosecution claim and fails to allege any due process right that was violated. *See Mazzone v. Town of Southampton*, 283 F. Supp. 3d 38, (E.D.N.Y. July 26, 2017) ("Because Plaintiff's due process claims are premised upon the same factual allegations of false arrest, false imprisonment and abuse of process asserted in Count III's Fourth Amendment claims, the due process claims must be dismissed as duplicative."). Jin also fails to show any official policy or custom of the City that resulted in a deprivation of her rights, which is required for a *Monell* claim. *See Wray v. City of New York*, 490 F. 3d 189, 195 (2d Cir. 2007). Finally, Jin's state law claims appear to be duplicative of her federal claims, and therefore fail for the reasons already explained. These claims, aside from malicious prosecution, would also be barred by

11

the statute of limitations, which requires that the action against the City to be commenced withing one year and ninety days from the date on which the cause of action begins to accrue. *See* NY General Municipal Law §§ 50-e; 50-i.[3]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Jin's claim for false arrest is the only remaining claim to be decided at trial.

SO ORDERED.

    /S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 13, 2023

---

[3] Jin filed her notice of claim on August 1, 2019 and commenced this action on August 10, 2020. For all state claims alleged except malicious prosecution, in order to be timely, she would have had to serve her notice within ninety days of the domestic incident, or July 12, 2019, and commence the action one year later. Because a malicious prosecution claim accrues as of the termination of the criminal proceeding in the plaintiff's favor, or when the charges against Jin were dismissed on May 15, 2019, this claim would still be timely.